JOHNSON CO. v. TOLEDO TRACTION CO.

(Circuit Court of Appeals, Sixth Circuit. January 6, 1903.)

No. 1,089.

1. PATENTS—INVENTION—NEW USE OF OLD DEVICE.

To sustain a patent for a new use of an old process or device, there must be some change in the manner of application or some result substantially distinct in its nature. If the new use is so nearly analogous to the former ones that the applicability of the device would occur to a person of ordinary mechanical skill, it is only a case of double use, and no invention is shown.

2. SAME—RAILWAY SWITCH WORK.

The Moxham patent, No. 536,734, for a railway switch structure, in which there is a recess or pocket for containing a removable plate of more durable quality than the remainder of the track, and which is grooved to form the flangeway and point, is void for lack of invention, in view of the structures of the prior art, upon which that of the patent is merely an improvement, made to meet new conditions brought about by the modern street railway service, and requiring the exercise of nothing more than ordinary skill of the mechanic.

3. SAME.

The Moxham patent, No. 540,796, for an improvement on the railway switch structure of patent No. 536,734 to the same patentee, the essential feature of which is the use of molten zinc or other retaining metal as a means for securing the removable plate in the pocket, is void for lack of invention, in view of the long and well-known use of that and similar soft metals for analogous purposes.

Appeal from the Circuit Court of the United States for the Northern District of Ohio.

For opinion below, see 116 Fed. 490.

This is a bill to restrain infringement of the first five claims of patent No. 536,734, and also of the only two claims of patent No. 540,796, both being patents issued to Arthur J. Moxham, and assigned to the Johnson Company, a corporation of Pennsylvania, the complainant below and appellant here. Both patents are for improvements in railway switch work, the second being only for an improvement upon the claims of the first. The inventor states in his specifications to his first patent that his invention "relates to frogs, crosses, mates, and similar structures in railway tracks, and consists in a structure in which the part subject to the most wear may be made more durable than the remainder of the switch piece and removable therefrom," and that the object of his invention is to provide a switch piece in which is inserted, at the point of excessive wear, a plate of more durable quality than the remainder of the track, and one which may be readily removed for realignment or replacing when desired. We insert below Figs. 3, 4, and 5 from the drawings of patent No. 536,734. Fig. 3 is a top view of a frog embodying the invention. Fig. 4 is a transverse section of Fig. 3 on line X, X, and Fig. 5 a longitudinal section of Fig. 3 on line W, W. The central portion, A, is formed by casting it of steel of the proper form, having a pocket or orifice adapted to receive the plate, B. This central casting, A, has also formed upon it short projections, conforming to the shape of the abutting

1. See Patents, vol. 38, Cent. Dig. § 31.

A  J.  MOXHAM.
RAILWAY SWITCH WORK.
No 536.734                                   Patented Apr. 2. 1895.

Fig. 5.

Fig. 4.

Fig. 3.

rails and in alignment therewith. To these projections are secured the abutting rails. They may be welded thereon by electricity or otherwise, or the projections may be long enough to permit of the usual splice bar joint. "The plate, B, may be either forged, rolled, or cast. Where it is rectangular, as in the case of the frog, I roll a bar of the desired width and thickness and cut the plates of the proper length from it. I then plane or mill the desired grooves through it to conform to the heads and grooves of the abutting rails. This plate may be made of harder steel than the rest of the switch piece, and, if desired, it may be made more durable by hardening, as case hardening, the upper surface. If cast iron, the wearing surface should be hardened by chilling. I will now describe my method of securing the plate in place in the pocket. In the bottom of the plate I screw bolts, E, having the washers, F. Around the inside of the pocket is a ledge or offset, G. I secure the plate in place, and fill the space beneath it with cement or melted sulphur, L, or some similar substance, which, when soft, will readily flow around the bolts and bond the whole in place; the ledge, G, holding it in position. When at any time it becomes necessary to remove the plate, it can be readily done by pulling up with sufficient force to fracture the cement or other filling. H, H, are dovetails in the side of the plate adapted to receive lewises when it is desirable to remove the plate." Claim 1 of this patent is in these words: "A railway switch structure, which consists of a metallic structure provided with a pocket in which a plate, which is grooved so as to form the flangeway and point, is removably secured; the rails of the remainder of said switch being secured to said metallic structure." The other claims vary little from the first claim. The second claim does not expressly describe the plate as removable, but adds the limitation that the rails shall be integrally secured to the principal structure. Claims 3 to 5 express the same combination in slightly different ways.

The two claims of patent No. 540,796 include the important features of the first patent, the difference being that a specific mode of securing the grooved plate in the pocket is included as an element in each. This specific method involves a pocket with inclined sides, larger at the bottom than at the top. The plate, B, is also formed wedge-shaped, and molten zinc is poured in the

space between the walls of the pocket and the plate. This zinc, when hardened, is said to secure the plate firmly in place. Figs. 4 and 5 of the drawings are inserted below:

A. J. MOXHAM
RAILWAY SWITCH WORK.

No. 540,796                    Patented June 11. 1895.

Fig. 5.

Fig. 4.

The space filled in by the molten zinc is shown at E. The specifications add that, "when at any time it becomes desirable to remove the plate, it is readily done by cutting away the zinc at E, and lifting the plate out, or, instead of cutting the zinc out, the plate might be heated sufficiently to melt it and so allow the removal of the plate." The claims of this second patent are as follows: (1) "A railway switch structure, comprising a body portion having the diverging rails secured thereto and having a pocket adapted to receive a plate, a plate in said pocket having flange ways and the point formed thereon, and a retaining material between the plate and sides of said pocket whereby the plate is held in position in said pocket." (2) "In a railway switch structure, in combination with a body portion having a pocket, a plate in said pocket having track surfaces formed thereon and a filling material between the plate and the sides of the pocket."

The court below held all the claims void for want of patentable novelty, and also held that there had been no infringement, if valid.

George T. Harding and John R. Bennett, for appellant.
Paul A. Staley and Border Bowman, for appellee.

Before LURTON, DAY, and SEVERENS, Circuit Judges.

LURTON, Circuit Judge, after making the foregoing statement of the case, delivered the opinion of the court.

Stated broadly, the claims involved present the question as to whether it was invention to devise a switch structure in which is a recess or pocket for containing a removable plate, which is grooved so as to form the flangeway and point, the rails of the track being secured to said structure in either of two well-known ways, and whether the use of molten zinc or other retaining metal as a means for securing the plate removably in its pocket involves invention. Omitting for the present the feature of the use of molten zinc as a means for securing such a plate in position, which is an element only in the claims of the second patent to Moxham, we shall deal with the question independently of that specific mode of retention.

Railway switch structures, having a metallic body portion with a recess for holding removable parts of the structure much subject to

wear, and having projections to which the connecting rails are to be secured, were old. The Griggs patent, No. 337, issued in 1837, after reciting that frogs had been theretofore cast or constructed in one piece, forming the two crossing rails, and that the rails at such in-. tersection are liable to greater wear and injury than the abutting rails, and therefore require more frequent replacement, proceeds to point out a remedy, which the inventor says "consists in so cast- ing or making the frog, or so forming it, by cutting or otherwise, so as to admit of frog plates of steel, iron, or other suitable material being let into the rails and forming a part of the track for two or three feet, more or less. * * * The frog plates are fastened to the body of the frog by countersunk bolts, fastened on the lower side by nuts and screws, or by keys, or they may be fastened by being filled with some exactness to the space left in the frog to receive them, and by being driven firmly into such space, or they may be otherwise fastened; the mode of fastening being a mere matter of ordinary mechanical skill." The claim allowed was for the frog plates thus described and applied, "of whatever material formed, and however attached to and connected with the main body of the frog." Thus this patent discloses the device of removable hardened plates secured to the body portion of a railway frog at the points of greatest wear. It is also an instructive patent in respect to the mode of securing such plates to the frog, and points out one method,— that of so casting or forming the body portion as to admit of the plates being "let into the rails and forming a part of the track for two or three feet, more or less." Though the plates thus secured are to be secured by bolts and keys, the inventor plainly refuses to limit himself to such a mode by claiming every mode of fasten- ing as a mere matter of mechanical skill. The inventor also foresaw that the channel at the bottom of the flange would wear where the flange of the wheel strikes in passing from one rail to the other, and to remedy this he points out that frog plates may be secured to the floor of the frog in the same manner. This Griggs patent, how- ever illy adapted to the great trains and heavy engines of the de- veloped steam railway, or to the modifications incident to the mod- ern street railway, with its sunken rails and its heavy cars swiftly drawn by electric power, is nevertheless the pioneer in the art of guarding against the excessive wear of the most-used parts of railway crossings by means of removable plates of harder metal. What- ever steps have been since taken to meet changing conditions of traffic carried on rails by either steam or electricity are in the last analysis but improvements upon the device of Griggs, a device almost coeval with the birth of steam railways.

The Curtis patent, of 1852, is another example of an early device for a metallic structure for the body of the frog with a centrally formed pocket for containing a removable frog point or tongue. Here the opening or recess for the frog point is in the body portion of the frog, and the point is removably pocketed in the body portion of the frog. It differs from the Griggs device, where the plates are let into the rails, rather than into the floor of the frog body, as in Curtis. The claim that the point in the Curtis patent is not pocketed,

because a part of it projects above the floor of the frog, is not very relevant. The value of being wholly or partly recessed or pocketed depends upon whether the structure is to be used upon an ordinary steam railway, where the tracks are above ground and the switch structures built up, or upon a street railway, where the convenience of other street uses require that the rails and switch structures shall be below the surface.

The reissue patent of 1864, to Lewis, shows a switch structure with a steel frog point of dovetail shape fitted into a dovetailed pocket formed in the body of the frog. As a means of fastening, a dovetailed block of metal fits between the end wall of the pocket and the pocketed frog point, as in the Moxham structure. The structure also shows a number of steel plates secured by rivets to other wearing points of the structure.

The English patent to Kenway shows a switch structure having a body portion, with a pocket into which a grooved plate is inserted in such a way as to be removable. This separate plate is secured in its socket by lugs, which pass through holes in the bottom of the pocket. Wedges are then run through holes in these lugs after the plate is in position.

It may be admitted that in none of these earlier patents do we find any precise anticipation of Moxham's device. But when the change from horse cars to electricity occurred, and heavy cars running swiftly upon sunken tracks in city streets raised the problem of how to deal with the question of the wear at the intersection with other lines, it would naturally occur to the street railway constructor to study existing methods in the allied industry of ordinary steam railways. We are not insensible to the fact that the old switch structure was not well adapted to the paved streets of a city, where the rails are sunken to diminish the inconvenience of ordinary street traffic. Neither is the switch work of an ordinary railroad subjected to the constant succession of jars and hammering blows incident to the multiplied traffic of a street railway intersection. That a flange bearing of removable hardened metal is required by a street frog or switch is due to the narrowness of the usual street car wheel and its consequent tendency to cut or dig a path in the floor over which it passes in going from one rail to another; a tendency not so noticeable in an ordinary railroad because of the wider tread of the car wheels and far less use. So, it was comparatively easy and cheap to take up and replace the whole frog when the structure was on top of the ground, while the paved streets of a city and the sunken rails required a switch structure difficult to remove, and rendering a removable wearing center much more desirable and economical, even if the wear were no greater in the one situation than the other. While, therefore, street and ordinary railway switch structures belong to the same general art, it is plain that the conditions presented by the modern street railway would present problems somewhat differing from those met by the early patents we have referred to, which were well adapted to the ordinary railroad and also to the horse street car. Nevertheless, it is a far-drawn argument to say that the devices from Griggs to Moxham were a mere groping

after the advantages first realized by the latter. The developments from the devices of Griggs, Curtis, Lewis, and others were not brought about by the defects of those appliances when applied to the railways they were intended to subserve, but by the new conditions brought about by the modern street railway service.

After a careful consideration of the expert evidence, the patents in evidence and the argument of counsel, we are unable to find that the circuit court erred in finding that the improvement made by Moxham involved nothing more than the ordinary skill of the mechanic acquainted with the art and with the new conditions to which the old devices were inadequate. This is strikingly illustrated by the history of the Moxham inventions as detailed by complainant's witness, O'Shea. This witness was manager of the switch works department of the complainant's business for years, and had charge of the manufacture of special work for street railways, and was a skillful draughtsman. Being asked how the making of these special switch structures came about, he said:

"A. Owing to the departure of the traffic from horse cars to motor cars, and the wear on the rails becoming greater, the intersection wore down much quicker than formerly on the first cars, and it was then taken up among all of us to see what could be devised that would make the intersection points hold up a longer period. Mr. Moxham suggested that some kind of a hardened center should be used, and gave unto me the working up of the details.

"Q. You may go ahead and state the result.

"A. Well, after considerable trouble I was successful in Harveyizing or hardening the plate that we thought would accomplish the purpose, and to the best of my knowledge it had done so up to the time of my departure, in 1895.

"Q. You may go ahead and state what means you adopted, as you state that the detail was left to you of holding this plate.

"A. Well, the plan that I adopted was the one shown on that sketch,—the first, that I made marked 'Original.' The first ingredient that I used in trying to hold the plate down was sulphur or brimstone, but we found that this worked loose, and then we took up the plan as shown on that sketch, marked 'Original,' to hold it down."

But it remains to inquire whether the special method of retaining the switch plate in its pocket by a soft retaining metal, which is an element in the claims of patent No. 540,796, involved invention. It is abundantly shown that in various branches of machine and foundry work soft retaining metal has been long used as a cheap device for fastening parts together and also for holding parts in alignment. Examples are shown in journaling harvesting machinery, hanging mill stones, in the construction of illuminated basements for buildings where the roof is used as a sidewalk, and wearing plates in mill machinery; and according to the evidence of competent machinists it has been a common practice in shops to use lead or zinc or other soft metal for leveling plates or castings, so as to adjust them and make them rigid or solid. Numerous other instances of the use of a retaining metal are shown, such as securing foundation bolts, securing verandas, putting bolts into coping stones, joining the ends of cast-iron pipes, such as soil or sewer pipes, in the construction of doorknobs, in which the shank of the knob was of a dovetailed or wedge shape; a soft retaining metal being used to retain the shank in its recess. Now, it is plain that in all these instances the use or

function of the molten metal is simply to retain the parts thus joined in their place rigidly.

Conceding, as we must, that Moxham was the first to use a retaining metal for holding a removable switch plate in its pocket, the practice of using a soft metal for retaining other mechanical parts in adhesion and rigidly was not new. Moxham used the metal in substantially the same way. The function which his retaining metal discharges is precisely the function discharged in the mill machinery step box, called the "Grunwold Step Box," to say nothing of the other instances included in the illustrations referred to above. At most he has used an old practice or idea in a new situation. Its well-known uses would plainly suggest its use in securing his plate in its pocket. Having all of these old uses of spelter before him, and he is chargeable with a knowledge of so common a method of uniting two parts rigidly and yet in such manner as that they might be separated without destroying either, it did not involve invention to employ the same practice in railway switch structures. If the strain to which the parts joined by such a method of fastening will be peculiarly aggravated, because they are parts of a switch structure, it is a difference in degree, and not of kind. There was no substantial difference in the method or purpose in using zinc as a means of retaining Moxham's plate in its pocket over its former well-known use in other branches of the founder's or iron worker's art. The only difference, as observed in Manufacturing Co. v. Cary, 147 U. S. 623, 633, 13 Sup. Ct. 472, 37 L. Ed. 307, is "in the use to which the resulting article is put." The well-known ductility of zinc had caused its use as a retaining metal, and this ductility was the best guaranty that it would stand blows and strains without loosening,— qualities which every skilled mechanic is taken to know. Its use by Moxham was plainly analogous to its former uses as a retaining metal, although never before applied in railway structure. It is merely a case of new use, without any change in the method of using the old element to adapt it to the new use or any new mode of application. In C. A. Potts & Co. v. Creager, 155 U. S. 597, 608, 15 Sup. Ct. 194, 199, 39 L. Ed. 275, 279, it was said:

"If the new use be so nearly analogous to the former one that the applicability of the device to its new use would occur to a person of ordinary mechanical skill, it is only a case of double use."

There will always be a point where ordinary mechanical skill and invention are so closely associated as to make it difficult to say upon which side of the line the particular matter lies. Where this is the case the doubt should be settled in favor of the patent. But by analogy to a number of well-known precedents we have no trouble in holding that the present case is not one of invention. Manufacturing Co. v. Cary, 147 U. S. 623, 13 Sup. Ct. 472, 37 L. Ed. 307, would seem to be peculiarly applicable to the case before us. The invention there involved was a method of restoring steel wire, which had lost its elasticity by mechanical straining, by subjecting it to given temperatures. The patent was limited to its application to "furniture or other coiled springs." It was held, however, that the process, as applied to those springs, was not different in method or effect from the same process when applied to any mechanically strain-

ed wire, or to steel made in straight pieces or strips, and that the invention was anticipated because the same method had been before used with wire clock bells and in blue haired springs and in marine clocks. To the argument that the prior use of the method with wire clock bells was for a different purpose from that contemplated by the inventor, and that the results were not analogous, the court replied:

"But we are of opinion that in the Cary process and the bell-making process the operations are precisely the same. In both, the operator is dealing with wire which is strained by being bent past the elastic limit, and is deadened thereby. The wire is blued by subjecting it to a degree of heat sufficient for the purpose, and is then allowed to cool. The result in both cases is the same, namely, the restoration, stiffening, and equalizing of the wire, and the only difference is in the use to which the resulting article is put. In both, the wire is made stiffer and more spring-like; these qualities being utilized, in one case in a furniture spring, and in the other in a clock bell. Cary observed that, in winding furniture springs, the wire, already weakened by the drawing process, was still further strained and deadened, so as to impair the quality of the spring. The question was how to equalize and stiffen the mechanically strained wire. The same problem had been solved by the clock bell makers, and the solution of the problem was merely the use of the knowledge possessed by those skilled in the art. The wire used in making the clock bells was also hard-drawn wire; but it does not appear that the process of the patent acts differently, when applied to strained hard-drawn wire, from what it would if applied to strained wire that was not hard-drawn. The difference contended for by the plaintiffs, between the process of bluing wire clock bells and the process of bluing furniture springs, in that one deals with spiral articles and the other with articles of a helical form, is not a difference in the process, but is at most a difference in the articles to which the process is applied. If the straining of furniture springs is peculiarly aggravated because of their shape, the difference is merely one of degree, not of kind."

In Pennsylvania R. Co. v. Locomotive Engine Safety Truck Co., 110 U. S. 490, 4 Sup. Ct. 220, 28 L. Ed. 222, a patent was held void for a device which employed an old and well-known method of attaching car trucks to the forward truck of a locomotive. In that case the rule applicable was thus stated:

"That the application of an old process or machine to a similar or analogous subject, with no change in the manner of application, and no result substantially distinct in its nature, will not sustain a patent, even if the new form of result has not before been contemplated."

In Mast, Foos & Co. v. Stover Mfg. Co., 177 U. S. 485, 20 Sup. Ct. 708, 44 L. Ed. 856, invention was denied to one who had adapted to a windmill the combination of an internal toothed spur wheel with an external toothed pinion, for the purpose of converting a revolving into a reciprocating motion. Yet in that case it was conceded that the device had been applied by the inventor when it had not been before used for that purpose. "The transfer," said the court, "did not arise to the dignity of invention," although the result added to the efficiency and popularity of the earlier device.

In Frederick R. Stearns & Co. v. Russell, 29 C. C. A. 121, 85 Fed. 218, this court held that it was not invention to transfer a device for lifting and holding and moving small articles, like pieces of cloth, metal, or paper, from one place to another, by attaching them to the ends of hollow tubes connected with an exhaust chamber from which the air was withdrawn by a pump or other exhausting device, to the pill-making business, when the same device was used with substantially no change for holding pills while dipping them in a gelatine bath.

Pertinent to the facts of the case at bar are the cases of Manufacturing Co. v. Cary, 147 U. S. 623, 13 Sup. Ct. 472, 37 L. Ed. 307; Ansonia Brass & Copper Co. v. Electrical Supply Co., 144 U. S. 11, 12 Sup. Ct. 601, 36 L. Ed. 327; Schrieber & Sons Co. v. Grimm, 19 C. C. A. 67, 72 Fed. 671; Aron v. Railroad Co., 132 U. S. 84, 10 Sup. Ct. 24, 33 L. Ed. 272; Brown v. Piper, 91 U. S. 37, 23 L. Ed. 200; Roberts v. Ryer, 91 U. S. 150, 23 L. Ed. 267; Griswold v. Wagner, 15 C. C. A. 525, 68 Fed. 494. The cases cited above from the supreme court and from this court would seem to establish the necessity of some change in the manner of application, or some result substantially distinct in its nature, before a patent can be sustained, based upon a new use of an old process or device.

We find no error in the decree of the circuit court, and it is accordingly affirmed.