**KELLOGG SWITCHBOARD & SUPPLY CO. v. MICHIGAN BELL TELE-PHONE CO. et al.**

No. 7468.

Circuit Court of Appeals, Sixth Circuit.

Oct. 10, 1938.

Floyd Williams, of Cincinnati, Ohio, and Curtis B. Camp, of Chicago, Ill. (Curtis B. Camp, of Chicago, Ill., and John Weld Peck and John Colville Taylor, both of Cincinnati, Ohio, on the brief), for appellant.

Merrell E. Clark, of New York City (Merrell E. Clark, William R. Ballard, and M. R. McKenney, all of New York City, and Frost & Jacobs, of Cincinnati, Ohio, on the brief), for appellees.

Before HICKS, SIMONS, and ALLEN, Circuit Judges.

SIMONS, Circuit Judge.

The present appeal, like that in 6 Cir., 99 F.2d 203, under the same style, this day decided, involves the art of telephony, and likewise a patent to Currier. While in the companion case we were concerned only with signals of subscribers coming to a single central office system, we deal here with the organization of trunk circuits between stations. The Currier patent involved is No. 1,283,400, granted October 29, 1918, on an application filed June 11, 1915.

The bill charged infringement of five patents. Two of them were withdrawn before or during the trial, and the decree below dismissing the bill as to the claims of those remaining is now challenged only in respect to claims 6, 7, 24 and 27 of Currier, No. 1,283,400. They are printed in the margin.[1] The court found 6 and 7 invalid

---

[1] 6. In a telephone system, trunk lines extending from one exchange to a second exchange, terminals for each end of said trunk lines, an operator's telephone set associated with the terminals at one end of said trunk lines, means responsive to the seizure of the terminal at the opposite end of one of said trunk lines for connecting said telephone set to said trunk line and for preventing the operative connection of said telephone set with another one of said trunk lines.

7. In a telephone system, trunk lines extending from one exchange to a second exchange, terminals for each end of said trunk lines, an operator's telephone set associated with the terminals at one end of said trunk lines, means responsive to the seizure of the terminal at the opposite end of one of said trunk lines for

because anticipated, 24 and 27 requiring a narrow construction to avoid anticipation, and so construed not infringed.

In the larger areas, where there are multiple central office exchanges or large exchanges with several stations, calls coming from telephone subscribers must frequently be passed from the switchboard of the calling subscriber's station to that of the called subscriber. For this purpose trunk lines lead from each station to the others. Two methods for completing the circuit between stations over a trunk wire were practiced in the art. In so-called "straightforward trunking" the "A" operator, that is, the operator answering the calling subscriber, received instructions from the "B" operator at the called station as to the trunk to be used over the trunks themselves. In "called wire" or "order wire" trunking instructions for completing calls were given over a separate line. In straightforward trunking the "B" operator was notified of a call from another exchange by the lighting of a lamp adjacent the terminal of the trunk, and in some cases by automatic connection of her head-set to the trunk through the "seizing" of the trunk by the "A" operator. Such automatic connection is called "automatic listening."

While order wire trunking was sufficiently rapid, it required special trunking operators and special trunking positions and multiple switchboards, and was faulty due to the stacking up of calls at a "B" operator's position. Straightforward trunking, while fairly satisfactory for small exchanges, resulted in many complaints of double connection at busy exchanges, for, though provision was made for the selection of an idle trunk by the "A" operator, this did not insure that the idle trunk would lead to an idle "B" operator.

Currier addressed himself to the problem of overcoming the stacking up of calls at the "B" operator's station. He contemplated an arrangement of terminals at the different exchanges whereby each operator would have both outgoing and incoming trunks, thereby performing both "A" and "B" operator work. He provided busy signals in connection with each trunk to indicate when it was in use, hoping by this arrangement to distribute the trunk calls evenly among the operators. He also provided a control circuit whereby, when an operator was busy with a connection, all trunks terminating at her position would so indicate until she had completed the connection, when the control circuit would restore the availability of her trunk circuits for further connections.

It is not contended that the instrumentalities employed by Currier to establish his control circuit were novel. The inventive concept, if any, resides in their arrangement, and their adaptation to accomplish the purposes either recited in the patent or now said to be inherent therein. The use of a line light to indicate a called line was a familiar signaling expedient in single exchange systems. Currier provides a relay by which the operator's telephone set is automatically connected to the trunk indicated by the lighted lamp, and a relay disconnecting the head-set from the trunk when the call is completed. The function of such relays and their availability for the purpose was well understood. In the conventional form adopted by Currier the in-

connecting said telephone set to said trunk line and for preventing the operative connection of said telephone set with another one of said trunk lines, and means for rendering said telephone set free upon the connection of said trunk line to a called line.

24. A telephone system including operators' link circuits; operators' trunk circuits; an operator's telephone set associated with said trunk circuits; busy signals for said trunk circuits; means responsive to the connection of an operator's link circuit to one of said trunk circuits for connecting said operator's telephone to said trunk circuit, to operate the busy signals of said trunk circuits, and for preventing the connection of another of said link circuits to said operator's telephone set via another of said trunk circuits.

27. A telephone system including operators' link circuits, operator's trunk circuits, an operator's telephone set associated with said trunk circuits, busy signals for said trunk circuits, means responsive to the connection of one of said operator's link circuits to one of said trunk circuits for connecting said operator's telephone to said trunk circuit, means also responsive to such connection for operating the busy signals of the other of said trunk circuits, and further means responsive to such connection for preventing the connection of another of said trunk circuits to said operator's telephone set while said set remains connected to said first trunk circuit.

sertion of the "B" operator's plug into the called subscriber's jack energized the "listening out" relay. But this, without more, would leave the "B" operator connected to every trunk at her position into which an "A" operator had plugged at distant exchanges without regard at the time to whether or not she was busy. So Currier, to protect a busy operator from receiving calls, provided a "busy operator relay" which, energized so long as the operator was connected to a trunk, would light a busy signal at each "A" operator's station and hold open the circuit of relays in each trunk so as to bar calls thereon when the operator was busy. Currier's method was to have the busy operator relay energize a relay in each of the non-busy trunks so as to close a circuit for the operation of the busy signal for that trunk through one armature and through another to hold open the circuit of the listening in relay. When the operator completed her work on one trunk, that is, when she had put her plug into the jack of the called subscriber, her listening connection to that trunk would be automatically opened and the busy operator relay de-energized for her position so as to extinguish the busy signal lamps and release their controlling relay for further use.

Currier's equipment would undoubtedly bar a double connection in some circumstances though not in others. The court found, and it appears to be conceded, that if two "A" operators would simultaneously seize trunks to the same "B" position both would thereto be connected, because the barring relays would not have time to act. This, however, is not a serious fault, for in practical experience such simultaneous seizing seldom occurs. The more serious defect in Currier is that when the "A" operator ignores the busy signals on the trunks leading to a "B" operator, and after seizing a trunk leaves her plug in the jack, the circuits of all barred calls will be closed the instant the barring relays are de-energized by the completion of an earlier call, whereupon all barred or stored calls will simultaneously be thrust upon the "B" operator, and this fault "will grow by what it feeds upon" because in the time consumed for sorting out the stored calls their number will further increase. The court thought this imperfection so grave as to deprive the invention of all commercial usefulness, but since the decree was grounded upon anticipation rather than want of util-

ity, and since the argument is pressed that absence of commercial history is due to the fact that the A. T. & T. had acquired substantially all potential customers for the patented system, there is little occasion to dwell upon the appellees' contention for invalidity upon that ground.

There is little persuasiveness in extravagant assertion that the inventor approached his problem from a new angle and disclosed a revolutionary change in practice by teaching the deliberate placing of calls upon busy trunks, to be there barred and stored until the operator was free to receive them, when such alleged departure from conventional systems, even if, inherent in the disclosure, is not proclaimed and appears not to have been perceived by the inventor himself. Nor is this virtue to be read out of the patent because the inventor was primarily concerned with warning "A" operators from busy trunks by signal lights and instructed operators to withdraw connections when busy signals are noted. On the question of validity, the first contention need not repel attack and the second does not condemn, since the familiar rule, of course, is that the patentee may claim for his invention all uses to which it may be put, whether understood by him at the time or not. C. & A. Potts & Co. v. Creager, 155 U.S. 597, 606, 15 S.Ct. 194, 39 L.Ed. 275.

Nor do we find it necessary at this point to consider the superior virtue of the appellees' system, however important comparison may become on the question of infringement. The appellant says that Currier successfully barred and stored one call upon a busy operator; that if he was the first to do this he contributed an important advance to the art for which the patent law rewards him, that notwithstanding subsequent improvements to his system, they may not defeat his patent. The contention if established is sound, for it is settled that an infringer's superiority of operation, even when brought about by a valuable improvement which perhaps was patentable as such, will not of necessity invalidate a patent or negative infringement. Gordon Form Lathe Co. v. Walcott Machine Co., 6 Cir., 32 F.2d 55, 61; Cleveland Trust Co. v. Schriber-Schroth Co., 6 Cir., 92 F.2d 330, 338.

The contention of the appellant that straightforward trunking, with or without automatic listening, does not belong in the

art of telephony since it was tried by the appellees for a number of years and abandoned, is rejected since the evidence is clear that the appellees had used a straightforward trunking circuit in a number of its exchanges for several years, and the court so found. It is unimportant whether order-wire trunking was substituted therefor by the appellees because of desire for uniformity of practice and equipment by all subsidiaries or for other reasons since Currier did not invent straightforward trunking, and a return to discarded practices when matured thought, new materials, new needs or economic expediency point the way, is not an anomaly in the arts. Firestone Tire & Rubber Co. v. United States Rubber Co., 6 Cir., 79 F.2d 948, 953. The question of validity here as in the court below is narrowed to one of anticipation, and to this we address ourselves.

Claim 6 of Currier provides, in a telephone system, (1) trunk lines extending from one exchange to a second exchange, (2) terminals for each end of said trunk lines, (3) an operator's telephone set associated with the terminals at one end of said trunk lines, (4) means responsive to the seizure of the terminal at the opposite end of one of said trunk lines (a) for connecting said telephone set to said trunk line, and (b) for preventing the operative connection of said telephone set with another one of said trunk lines. It has already been noted that relays connect the head-set of the operator to the trunk, and that while she is making her connection a busy operator relay and other relays disable the call receiving relays in the trunks. Claim 7 adds a fifth element: "And means for rendering said telephone set free upon the connection of said trunk line to a called line." From the specification we learn that when the "B" operator inserts the plug in the jack of the called subscriber's line to complete the connection a relay is operated so that she is disconnected from the trunk when the busy operator relay is de-energized. Claims 24 and 27 include a sixth element: "Busy signals for said trunk circuits." These signals are depicted as lamps on the various trunks leading to a busy operator, which are lighted by means of relays, and they constitute in the language of the specification the busy indication which "serves to keep other operators from extending connections to this busy operator." There are thus in Currier two safeguards against a double connection—the busy indication

lights, and if they fail or are unnoted, the busy operator relay, which energized when the "B" operator is connected to a trunk not only lights the signal lamps but bars connection to her head-set of further calls by keeping the circuit of the relays in other trunks open.

Claims 6 and 7 were held to be anticipated by the patent to Johnson, No. 1,185,331, granted May 30, 1916, upon an application filed February 24, 1913, the patent to Martin, No. 1,303,937, granted May 20, 1919, subsequent to Currier but on an application filed as early as November 25, 1914, and renewed in 1918, and the German patent 198,179 to Paul Block, published May 4, 1908.

Johnson discloses automatic switches which when the "A" operator plugs the link circuit into an outgoing trunk selects an idle trunk leading to an idle operator. Thereupon the call lamp lights to advise the "B" operator of the connection and her head-set is connected to the trunk by an automatic listening relay. When she plugs into the called subscriber's line her telephone set is disconnected and prepared to receive additional calls. When the "B" operator is busy the busy operator relay indicates that condition on the distant trunk terminals by electrical potentials to which the switches are responsive rather than by signal lamps as in Currier. Whether the busy operator relay of Johnson also holds open the call lamp lighting and listening in relays in the other trunks, as contended by the appellees, found by the court, and vigorously denied by the appellant, seems to us unimportant, for it does put a ground potential upon the terminals of the switches so that they cannot stop on trunks leading to busy operators, and the substitution of a well understood equivalent for an old element does not negative anticipation, just as it would not avoid infringement, if later. When the "B" operator of Johnson plugs into the called line, the busy operator relay is released, busy signals are removed from the idle trunks, and the call lamp "listening in" relays are operable upon the seizure by "A" operator switches.

In Martin automatic switches place the call with the "B" operator without intervention of an "A" operator. A call lamp lights on the trunks and relays cause her telephone to be connected. The busy operator relay is energized during the time she is connected to the trunk and an electrical potential as

a busy signal is placed on the trunks. It holds open the circuit of the call lamp lighting and listening in relays. When the operator plugs into the called subscriber's jack she is listened out and the busy operator relay is de-energized. If two trunks to the same operator are selected, only the lower is connected, and the other is held off until the former is served. In the German patent when calls are routed to the active operator a call lamp is lighted and she manually connects her telephone to the trunk. A busy operator relay remains energized until she disconnects. The relay when active extinguishes and keeps dark a lamp as a busy signal at the distant end of each trunk. Other calls are kept from the busy operator since the call lamp lighting relay is rendered ineffective to light the call lamps for other trunks. Upon completion of the call the operator manually disconnects her head-set and the busy operator relay is de-energized.

So in Johnson and Martin there are relays which when a call is received connect the operator with the trunk and likewise a busy operator relay which disables the call receiving mechanism. In the German patent the operator makes a manual connection. Claim 7 of Currier calls for means that free the operator's head-set upon connection of the trunk line to the called subscriber. Martin and Johnson have such relays. While in the German patent the operation is manual, yet in each instance the busy operator relay is de-energized and the way opened for reception of other calls. Claims 6 and 7 refer to the barring mechanism alone without any reference to the busy signals. We are convinced that they are anticipated by the patents herein discussed, and that the court below was not in error in holding them invalid.

It is no answer to the references to say that Johnson was primarily concerned with providing a speech recording device rather than a barring mechanism, for if Johnson taught the art anything by way of arrangement of armatures and relays that would prevent more than one call at a time coming to the head-set of an operator, it is immaterial that his concept comprehended more than this, just as Currier is entitled, as noted, to all the novel and useful features of his invention even though his primary concept may have been merely the safeguarding of the operator against multiple calls by relays which energized the signal lights and disabled the calling mechanism when his operators were busy. Likewise is it no answer to say that Martin and the German inventor were not concerned with trunking systems at all, but merely with the system of a single central office exchange, for if they disclosed an organization of relays that barred multiple subscriber calls from the busy operator, it would involve no invention to adapt the system to safeguard a "B" operator's head-set from multiple calls by "A" operators.

Consideration should be given to what is stressed as Currier's marked departure from the teachings of the art and urged as a new principle of operation in trunking calls, for which great merit is claimed. The automatic switch of Johnson, it is said, is incapable of making an operable or non-operable connection with a busy trunk leading to a busy operator because the electrical potentials placed upon the outgoing terminals of the trunks prevent closing of the circuit and the switch must move on until it makes contact with a trunk terminal leading to an idle operator. When such trunk terminal is found unguarded the signal to the "B" operator is given and the call is completed. In Currier when the signal lights fail and the barring mechanism functions there is a non-operable contact with a trunk to a busy operator which becomes an operable contact when the relays free the trunk of barring signals and the operation of the disabling mechanism. From this it is argued that Johnson does not bar calls to a busy operator and Currier does, with a connotation given to the term "barring" so as to include not only prevention of calls but the storing of them until the operator is free. It is a nice distinction, and not easy of comprehension. The Johnson mechanism not only prevents calls from being thrust upon a busy operator, but stores them for connection with the first contacting trunk terminal that is freed from the busy signal potential. A still more refined distinction is that the Johnson delayed call will be completed over the first freed trunk while the Currier delayed call will be completed only upon the trunk with which the non-operable contact is first made, or as the appellant puts it, upon the trunk which is seized by the "A" operator.

With deference to the rule that a prior device does not anticipate even though by modification it may be made to accomplish a function performed by the patent

if not designed for that purpose by its maker or adapted for use therefor, Topliff v. Topliff, 145 U.S. 156, 161, 12 S.Ct. 825, 36 L.Ed. 658, we doubt that this, in the light of the commercial requirements of a large telephone system, is a patentable distinction. Johnson, to some extent Martin, which resembles it, and the German patent, teach the use of a barring mechanism in circuits on trunks between exchanges or in like environment. While a mere concept is not patentable, and must be accompanied by mechanical embodiment, which must itself be unanticipated, Voightmann v. Perkinson, 7 Cir., 138 F. 56, 57; Weir Frog Co. v. Porter, 6 Cir., 206 F. 670, 675; Bullock Electric Mfg. Co. v. General Electric Co., 3 Cir., 162 F. 28, 36, Johnson and Martin disclosed to the art substantially the arrangement of relays and armatures by which calls could be barred from busy operators and means by which at least one delayed call could be brought in after the bar had held it off. The instrumentalities employed, their organization and method of operation, are substantially the same in Currier, even though nice distinctions in utilization may now upon close analysis be perceived. The references have no commercial history. The inference is not to be resisted that they did not advance the art because they did not solve the whole problem. Neither did Currier.

While claims 6 and 7 relate but to the barring mechanism, claims 24 and 27 are busy signals and means to operate them. In Martin and Johnson we have seen that these busy signals are potentials, while Currier and the German patentee employ lamps. Currier uses the lighted lamp to indicate that the operator is busy while the German patent reverses the signal. A mere change of code is of doubtful patentability. But assuming validity, claims 24 and 27 are not infringed. They must be given a narrow construction in the light of the prior art, and must be confined specifically to what they disclose. The defendants' lamps are not busy signals in the sense of Currier. Where employed they indicate a trunk available for use without information as to whether the "B" operator is idle or busy. The barring mechanism is independent of the lamps and is provided by a double chain of relays. If the operator is busy the calls are stored and connected one at a time in the order that they rest upon the trunk. Claims 24 and 27 are not infringed.

The decree below is affirmed.