RAUCH & LANG CARRIAGE CO. v. HANLON et al.

NATIONAL AUTOMOBILE CHAMBER OF COMMERCE v. SAME.

(Circuit Court of Appeals, Sixth Circuit.   June 6, 1916.)

Nos. 2830, 2831.

1. PATENTS ⟨⟩328—INVENTION—SHIELD FOR CAR WINDOWS.

The Hanlon reissue patent, No. 13,653 (original No. 993,061), for a shield for car windows, consisting of a supplementary window or sheet of glass hinged at the top of the front window of a street car or closed automobile, which swings outwardly and can be fixed and held at any angle, forming a shield to protect the upper part of the inner window from rain or snow and to have a clear span through which the driver can see, is void for lack of invention in view of the prior automobile art.

2. PATENTS ⟨⟩27(1)—DOUBLE USE.

The application to a closed car of the form of wind shield known on open cars *held* double use.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 31; Dec. Dig. ⟨⟩27(1).]

Appeals from the District Court of the United States for the Eastern Division of the Northern District of Ohio; John H. Clarke, Judge.

Suits in equity by William B. Hanlon, the Anderson Electric Car Company, and others against the Rauch & Lang Carriage Company, and against the National Automobile Chamber of Commerce. Decrees for complainants, and defendants appeal. Reversed.

F. P. Fish, of Boston, Mass., for appellants.

C. P. Byrnes, of Pittsburgh, Pa., for appellees.

Before KNAPPEN and DENISON, Circuit Judges, and EVANS, District Judge.

[1] DENISON, Circuit Judge.   Infringement suit on patent to Hanlon, reissue No. 13,653, December 2, 1913, original No. 993,061, May 23, 1911, application filed April 11, 1910, for "shields for car windows." Claims 1 and 2 are involved; claim 1 is given in the margin.[1]  The court below held the patent valid and infringed, and the original defendant below, the Rauch & Lang Company, and the Cham-

---

[1] Claim 1. The combination with a vehicle having an observation window at its forward end, of a frame hinged at its upper edge to the vehicle above and in front of said window and having a transparent pane or panel arranged to extend in a forwardly and downwardly inclined position in front of the upper part of said window, said angular pane or panel being positioned so that the line of vision of the driver is below its lower edge, the frame and its pane when in vertical position being separated from the observation window by a dead air space tending to prevent the formation of frost on said window, and when in an angular position forming a storm shield to prevent the weather from beating against the window, said frame being movable on its hinged connection to its different positions, substantially as described.

ber of Commerce, later brought in to defend, prosecute these appeals. Figures 2 and 3 of the patent are herewith reproduced.

The device shown comprises an ordinary sliding window (3) at the front end of a street car vestibule, which may be raised to close the entire opening or may be dropped into the casing below to let air enter. In front of this first window, and hinged at its upper edge, depends a supplementary window, or sheet of glass. This swings outwardly upon its hinge, and may be fixed and held at any desired angle. When in a projecting or angular position, it acts like the eaves of a house or the visor of a cap, and, as the car moves forward, protects the space behind and for a short distance beneath it from falling rain or snow. The angle will be so adjusted that there will be a clear line of vision from the driver's eye, extending beneath the lower edge of the visor to the ground in front of the car. The driver thus escapes the obscuration which would result if the window or shield were vertical and became covered with rain or snow. When the first or rear window is closed, it is protected from such rain or snow over a zone extending from the top to a point approximately horizontal with the lower edge of the shield, and thus the driver's same line of clear vision is left unobstructed and yet the storm is wholly excluded from the car.

This controversy is concerning the use of such a shield upon closed bodies for automobiles, and the claims cover such a use. It follows that the state of the art in automobiles is as pertinent as that in street cars. The state of this former art, prior to the original application, may be easily understood. Automobile closed bodies with a glass front, either in permanent form or in the shape of a window which could be raised or lowered, were well known. The now familiar "clear vision" wind shield for open cars was also in common use. This com-

prised a glass front held in a supporting frame and divided horizontally into two sections. The upper section was hinged at the top and could be swung outwardly and adjusted at any desired angle. It was structurally the same thing, it was operated in the same way, and it gave the same result as the shield of the patented device, excepting that, when looking out under the edge of the shield to the ground, the driver looked through an open space instead of through a pane of glass. The patentee must be thought of as seeing before him, on a salesroom floor, an automobile with a limousine body inclosed on all four sides, the front consisting of a glass window which could be lowered part of its height or all of its height to admit fresh air, and also as seeing, by its side, an open automobile having a glass front, the upper part of which could be swung out forwardly so as to be a shield or visor and so as to give the clear vision function. This situation presents sharply the question of invention which is to be decided.

Analyzing the advance made by Hanlon, we see that, from one point of view, when the user of the open car found that if he had the upper part of the wind shield swung out, the storm beat in under it because this adjustment left an opening through which rain and snow could get in, he put in a pane of glass or a window, fixed or sliding, to close the opening and keep the storm out. From the other point of view, when the user of the closed car observed that the front window, when shut, would become blurred with rain or snow, he added the projecting, swinging shield or visor found in the open car, and so insured a line of clear vision through the inner glass. From neither point of view can we see invention. To put a glass in an opening, or to shelter an existing glass window by the same means common for sheltering an existing open window, seems obviously within the intelligence of the ordinary person—to say nothing of one who is "skilled in the art." Each is, at the best, as applied to closed automobile bodies, only a new use of an existing structure, not requiring mechanical adaptation, save in the form or shape of the supporting hinges or guides—indeed, no mechanical adaptation whatever is necessary, unless it happens that the two places of application are of different size or shape. See illustrative double use cases collected in note to Weir Frog Co. v. Porter, 206 Fed. 670, 674, 124 C. C. A. 470.

The absence of invention is emphasized by the fact that when the patentee lowers his sliding window in his street car vestibule, as he does in pleasant weather, his structure no longer embodies his patented structure, because he has no closed glass window protected by swinging glass in front. When the question of infringement depends upon opening or closing a window it is not easy to understand how the patent can be the embodiment of an inventive step. The same conclusion is somewhat fortified by the conduct of defendants' officers. A user complained that the front window of a closed electric automobile gave trouble through fogging by rain or snow, and suggested that defendant add the familiar swinging wind shield. This was done; and although it was at once apparent that the idea had commercial value, no one thought of applying for a patent.

Undoubtedly, the device has gone and is going into very general

use. Its utility is marked. In some cases, this adoption and utility might be persuasive that invention exists; but we think this case is too clear for the application of that criterion. Very likely the true explanation why the device was not thought of and given this application earlier is because prior to 1910 the use of closed automobile bodies had not been general enough to challenge attention to this trouble, and because the art was developing so rapidly that attention was centered on other more serious matters; at any rate, these considerations partly explain the absence of direct and clear anticipation. We pass by without consideration some approximations which are claimed to anticipate.

[2] It is said that when the outer window is not projected as a storm shield, but is allowed to hang vertically just in front of the inner window, there is produced a quasi dead air space between the two which causes a two-step instead of a one-step difference in temperature between the warmer air inside the car and the cold outside, and which, therefore, prevents or minimizes condensation of moisture on the inner surface—which condensation or "frosting" is troublesome under some conditions. Whether this beneficial result actually follows in substance rather than in theory is not very sure, but, if we assume that it does, it is only an additional advantage coming from a new use which is, inherently, a mere double use; and if, as we hold, there is no invention in adding this angularly projecting and adjustable glass shield in front of a window and in carrying it in an extended position of adjustment, there cannot be invention in carrying it in any other position of adjustment. If the outer window, dropped into this vertical position, has any aspect not already considered, it is that of the familiar double window in residences whereby heat radiation from the room is lessened. For these reasons, we cannot find in this function any more validity for the claims than we find in the angular position of the shield.

We conclude that both decrees must be reversed and the cases remanded, with instructions to dismiss the bill.