## OILGEAR CO. v. J. N. LAPOINTE CO.
### No. 364.

Circuit Court of Appeals, Second Circuit.
May 1, 1933.

George T. May, Jr., and Frank Parker Davis, both of Chicago, Ill., and T. Clay Lindsey, of Hartford, Conn., for appellant.

Charles Neave, of New York City, and Everett E. Kent, of Boston, Mass., for defendant-appellant.

Before MANTON, L. HAND, and CHASE, Circuit Judges.

MANTON, Circuit Judge.

Plaintiff sued on claims 3, 11, and 12 of the Ferris patent, No. 1,468,595, issued September 18, 1923, for a broaching machine. The defendant answered and filed a counterclaim for infringement of claims 6 and 7 of its Lapointe patent, No. 1,109,847, granted September 8, 1914, for its broaching machine.

A broach is a variety of a machine cutting tool. It consists of a rod sometimes having one tooth, but usually a succession of teeth of progressively increasing size, to be pushed or pulled through a hole for enlarging, reshaping, or refinishing the hole, or, where external broaching is the work, to be pushed or pulled over the surface of the metal for reducing, shaping, or finishing the surface. It differs from the other tool machines only because it has a broach.

The Ferris patent proposes the use of a reversible, constant speed, variable displacement pump which, when rotated by power at a constant speed, will cause a fluid to be pumped in varying amounts as desired. It can be adjusted to change the direction of the flow. It is not necessary to describe in detail the pump, for that in itself is not claimed to be new. The patentee does not claim he has devised any new form of broaching tool, nor does he claim to give a tool any new movement in either the cutting or return stroke. He does not claim any new form of variable displacement pump, nor is there a claim of any particular co-ordination of the pump to the tool in any new way. Both the tool and the pump perform their functions as was known theretofore.

The variable displacement pump is used

as a means for driving the tool and operating the machine, to exert great power, and it can, when properly designed, produce a movement which is steady and is at the same time capable, readily, of any desired variation in speed. When used to operate a broaching tool, it performs the work of its well-known inherent characteristics. Theretofore it was regarded as prohibitive for ordinary use, because of the cost of operation. It is established that Ferris was not the first to realize that it was useful and efficient to use such a pump for operating a broaching tool.

The broach is a well-known form of cutting tool. Some broaches have single cutting edges like a chisel, and, if the operator desires to enlarge or change the shape of the hole in a piece of metal, he may do so by pushing or pulling through it a broach having only one tooth of a size to take off a small portion of the metal in one traverse or a larger broach taking off a larger piece of metal, or he may, as is more commonly done, use a broach having a number of succeeding cutting teeth; each tooth cuts into the work surface left by the preceding tooth. Both types of broaches perform the complete cutting operation by a single straight stroke.

Various kinds of machines use reciprocating cutting tools or similarly moving pieces of work to be cut, such as planing, shaping, slotting, grinding, and milling machines. Broaching machines are of this same type. Sometimes the power is applied by mechanical means, as by having a line of shafting connected with the machine tool or by using pulleys and a belt. In other instances, the power is applied by an electric motor attached to each individual machine. The rotary pulley or motor may reciprocate the work or the tool by means of joints, toggle joints, rack and pinion, nut and screw shaft, or other forms of mechanical connections. In other cases the tool or the work to be reciprocated is attached by a rod to a piston which is reciprocated by means of a liquid which is forced by a pump into a cylinder on one or the other side of the piston, depending upon which direction the stroke is desired. This method may use variable displacement pumps, sometimes referred to as hydraulic pumps, and usually using oil as the fluid pumped. This type of pump is driven at constant speed; the pump mechanism being such that by a simple adjustment its pistons can be set so as not to move at all in their respective cylinders, in which case they do not displace or deliver any fluid even though the pump continues to be driven at constant

speed, and, by other adjustments, the pistons can be set so as to displace or deliver fluid at any predetermined rate in one direction, and, by different setting of the pistons, can be caused to displace or deliver fluid at any desired or predetermined rate in the other direction. This has given rise to their characterization as constant speed, variable displacement or delivery, reversible pumps.

Pumps of this kind were well-known prior to the filing date of the Ferris patent. It has been common to use one of these pumps to deliver fluid under pressure to a similar mechanism which is driven by the fluid or to deliver fluid to a cylinder where it acts to give a piston a reciprocatory motion in a straight line. As early as 1917, Butler, in his book Transmission Gears, stated, under the heading of "Hydraulic Transmissions," the many purposes for which a hydraulic variable speed reversible transmission is peculiarly applicable, such as swing bridges, ships' turrets, heavy ordnance, or any intermittent work where a precise motion in either direction is required to be transmitted at a variable speed and against a variable resistance. He also spoke of the much higher constructional cost, and said that any pressure oil drive involved considerable complexity and cost as compared to a gear drive. In a magazine article (Cassier's Magazine) published in May, 1908, after describing portable hydraulic tools for punching or shearing metal, mention is made of hydraulic presses with motor-driven pumps attached to or mounted on the machines and the hydraulic broaching press, which is used for finishing square, hexagonal, or oblong holes in steel or metal parts, is mentioned as among this class of tools. A direct connection between the pump and the cylinder, in which the oil delivered by the pump is to act, was not new in this patent. The patentee admits that theretofore hydraulic presses were driven by a pump which, at each stroke of the plunger, caused a definite amount of fluid to be forced into a cylinder there to act to move a piston; a direct connection existing between the pump and the cylinder.

The Waterbury Tool Company had a variable displacement pump and the Hele-Shaw pump was of that type. These forms of pumps were used by the defendant in its alleged infringing machine. The Waterbury pump is entitled the "Variable-Speed-Transmission Device," as shown in the Janney patent, No. 924,787 (1909). This was a constant speed, reversible and variable displacement or delivery pump. It was directly connected to a motor. It had accurate control.

These pumps were recognized as being adapted to operate machine tools, both rotating and reciprocating, and other apparatus requiring large or small power and perfect control. In a later Janney patent, No. 1,254,695, one method of connecting the speed gear to a planer is illustrated, and the patent refers to its advantages for driving mechanism in general. It refers to the variable speed gear shown and says the mechanism can be employed with advantage in many and widely different connections, and states that one of the primary purposes of the invention is to provide effective means in a ready and quick manner to obtain speed changes or variations in velocity of a member driven by said mechanism of whatever nature said member may be.

Crain in his patent, No. 1,250,564 (1917), by drawings, shows parts of a planer and explains a driving mechanism which, when combined thereto, is adapted to reciprocate the bed of the planer, and through the agency of suitable means to vary the velocity of the bed on each of its movements and, what was said to be most important, to reverse the movement of the bed by hydraulically operated control means. He states: "The bed of a planer as will be understood is merely one example of reciprocatory and oscillatory element with which the driving mechanism can be operatively related." Crain disclosed a variable displacement reversible hydraulic pump directly connected with the work to be reciprocated. The engineering notes from notebooks of two employees of the Waterbury Company, made from December, 1914, to June, 1916, show that one of the pumps was used in that company for driving a lathe and plans were made for using the pump to drive a planer, a tunneling machine, a reciprocating log feed, a cloth printing machine, and a broaching machine. One employee determined the factors to be considered for both vertical broaching and horizontal broaching and for pull broaching as well as push broaching. Another employee in his notebook likewise shows work and study made of the use of pumps on broaching machines. At the time the cost of pump driven machines was deemed prohibitive. This shows knowledge of the feasibility and the desirability of making a combination of pump-driven machines as early as 1915, and all that is set forth in claims 11 and 12 sued on was fully disclosed.

The other type of pump used by defendant, the Hele-Shaw type, was used by Martineau in patent No. 1,098,280 (1914) with a reciprocating planing machine. The pump is continuously driven. In 1918, Martineau disclosed the use of the pump for driving broaching machines. The applicability of the reversible variable displacement pump to broaching machines is listed in the list of applications of the Hele-Shaw pump. The claims 3, 11, and 12 in suit make no claim of details to solve the problem of applying the variable displacement pump drive to particular machines, and no patentable invention is claimed thereto. In June, 1914, an article in the American Machinist shows the use of a variable delivery pump, the functions of which were to move the tool through the work during the cutting operation. The oil pumped by it went directly to the piston which operated the tools to move them down through their feeding cut. Other movements by the machine were executed by the oil derived from an accumulator. An illustration (Conradson) compared with the illustrations used by the plaintiff, illustrates exactly the same quality and characteristics of the pump which it uses; that is, steadiness of action and perfect control of the feed. There was therefore nothing new in this means for driving the tool. The patent shows and describes the ordinary hydraulic ram, consisting of a cylinder in which there is a piston, the rod or shaft of which is connected with the tool for reciprocation as described in these previous uses and patents to which we have referred.

The claims sued upon are for a combination of a member for actuating a broaching machine, the hydraulic means for driving said member, and a reversible variable displacement pump to deliver liquid under pressure to a hydraulic ram and to give reciprocatory motions as a pump and ram always do. The broaching machine is not made a part of the combination; the tool is not shown in the patent drawing, and any tool may be attached to the tool holder. No patentable ingenuity is disclosed, for there was nothing new or patentable in using this type of pump for driving a broaching tool. De Forest v. Gen. Elec., 283 U. S. 664, 51 S. Ct. 563, 75 L. Ed. 1339; Willett Mfg. Co. v. Root Spring Scraper Co., 55 F.(2d) 858 (C. C. A. 6).

■ Invention may not be claimed for some new and unexpected result in driving a broaching tool with this type of pump, as it was known that, when the broach is pulled or pushed through or along the work, there is a variation in tool resistance when each successive tooth enters and leaves the work

as there is a variation and resistance when a single planing tool enters and leaves the work and when any cutting tool enters or leaves a hole in a casting being cut. One of the inherent characteristics of the variable delivery pump drive is that it is capable of giving a steady tool movement in spite of variations in resistance, and this was recognized by the patentee. Discovery of new uses for or newly observed functions of the device well known in a mechanical or structural art is not patentable invention. Pennsylvania R. R. v. Locomotive Truck Co., 110 U. S. 490, 4 S. Ct. 220, 28 L. Ed. 222; Grand Rapids Refrigerator Co. v. Stevens, 27 F. (2d) 243, 247 (C. C. A. 6); Northern Trailer Co. v. La Plant, 21 F.(2d) 696 (C. C. A. 8); Dunham Co. v. Cobb, 19 F.(2d) 328 (C. C. A. 6); Weir Frog Co. v. Porter, 206 F. 670 (C. C. A. 6).

The claims sued on are invalid.

■ The Lapointe patent disclosed a double spindle screw type machine. It added to the inventor's single spindle machine the devices associated with the upper screw spindle shown in the drawings. The single spindle machine was equipped with the automatic stop devices shown in the lower part of the drawings by which it would be automatically disconnected from its driving pulley at each end of the draw head's stroke, and the stops thereof, defining the ends of the stroke, were adjustable so that the stroke could be changed both in length and in locus with respect to the face plate of the machine. The inventor made provision in his double spindle machine, by a mechanical arrangement, for breaking and re-establishing, at will, the driving connection between the main spindle and the auxiliary spindle.

The claims of the patent in suit, which it is charged the plaintiff infringes in its hydraulic double spindle machine, relate to the variability of stroke length. It is claimed that the plaintiff's single spindle hydraulic machine had the same variability both of locus of stroke and length thereof that the single spindle screw type machines had. But its two spindle, "Twin-Ten" machine has variability of spindle stroke length only. It has no variability of locus of the spindle stroke, and cannot have it. It is said that, dealing exclusively with hydraulic forces in the operation of its machine, plaintiff has independently developed its stroke length changing results by means different from Lapointe and a mode of operation thereof different from his, so that the accused machine is not an infringing equivalent of Lapointe's

regardless of the verbal arrangement of Lapointe's patent claims. In Lapointe's machine, when two blades are shifted to their respective idlers to stop the machine, a weighted brake is allowed to act on the drive pulley to prevent objectionable coasting of the rotating parts. Shifting the straight belt to the drive pulley causes travel of the main screw spindle in one direction while driving of that pulley from the cross-belt reverses the spindle's direction of travel. The spindle's crosshead striking either stop moves the belt shifter to throw the driving belt to the idling position and to apply the brake. To start the machine again in reverse action, the operator throws his handle to bring the appropriate belt into driving engagement with the pulley. In the double spindle machine Lapointe provides a duplicate set of stops for the added cross-head. Its control rod communicates its motion to the main spindle's stop rod through a small interposed gear; both rods in the double structure of the patent being arranged between the spindle troughs, one above the other. The machine functions completely without the extra set of stops.

In the plaintiff's "Twin-Ten" construction, the variable displacement pump is not reversible as it was in the single spindle Ferris machine, but the hand wheel on the pump serves to adjust its piston stroke length to give the desired broaching speed. The pump's pressure side always delivers the oil to the pipe 18 (Plaintiff's Exhibit 30), and its return side takes the return oil through pipe 10, but a three-way valve serves much the same purposes that pump reversibility does. While in neutral position, the valve stops the broaching machine by "short circuiting" pipes 18 and 19 so that the pump while continuing to pump is merely idling. Put into another position, the valve delivers the oil to pipe 21 and receives the oil from pipe 20. In a third position the connection with pipes 20 and 21 is reversed. Each of the ram cylinders has only its left or pull end connected with the valve to receive oil or to return oil as the case may be. The upper cylinder is connected to pipe 21 and the lower to pipe 20. The right ends of the cylinder are in open connection through a passage, and in the space between the piston heads a body of oil is trapped to maintain the spacing of the piston heads and permit that one which gets the oil to push the other back to a loading position. Therefore there was no capacity for single spindle operation in this arrangement. Each cylinder gets its broaching pull power independently direct from the pump. Each piston is unable to return to a loading

position until the other piston propels it through the intermediary of the trapped oil.

The three-way valve position is controlled by a rock-shaft which has the operator's handle rising from it, and the single, bevel-headed stop curving down and toward the face-plate. The stop is adjustable along the rod and is beveled on both sides so that the beveled projection of either drawhead may, when striking it, rock the shaft back to its neutral full-line position. There is no stop to define the loading position near the face-plate. Each piston is and must be returned until it firmly stalls against its cylinder head. In the double spindle screw type machine, once the length of the stroke is set, that length remains fixed until intentionally changed. This is not true of the plaintiff's hydraulic machine. Special provisions are made to maintain the stroke length—to keep the two pistons in phase in their alternate operations. The oil trapped in the communicating ends of the cylinders is what enables the upper piston to move the lower piston home into stalling contact with its cylinder end. The oil in these cylinders lubricates the pistons, and the oil on the opposite sides of each piston bears a different pressure. The trapped oil is bound to diminish as the machine is run unless it is constantly replenished. It must be replenished to obtain the desired positiveness of the full return of each piston into solid contact with its cylinder end. Special provision is made for this replenishing by an arrangement so that, as the working piston is being propelled by the oil under heavy pressure, a slight amount of oil leaks into the trap through a very restricted leakway. It produces an excess of oil in the trap so that the returning piston comes to a positive stall against the end of its cylinder slightly before the working piston gets to the end of the working stroke. The continued travel of the working piston, necessary to cause its striker to rock the control shaft to the machine stopping position, forces the excess of oil out of the trap space, past a check valve, and the oil thus forced out of the system goes to the supply reservoir. The oil forced out of the system in this manner is restored to it by the gear pump which delivers its compensating volume of oil to the low pressure return pipe of the variable displacement pump past a check valve. The gear pump is built into the machine and is constantly driven, as is the variable pressure pump. Thus it is that there is necessity of always stalling the returning piston against the cylinder head to prevent the possibility of its getting out of phase, and that accounts for the absence of any adjustable stop at the loading end of the control rod to determine the loading position of the drawhead.

By its contrivance the plaintiff's machine is possible of variation to lengthen the stroke and also to shorten the stroke. There are distinctive characteristics of the operation of each machine which, together with the construction of each, acquits the plaintiff of the charge of infringement of this patent. The plaintiff had a different problem to face than did the defendant.

The two types of pull broaching machines to which the defendant's stroke-length-change provision was applicable, were the screw type machine and the rack type machine. In these mechanical drive machines there was the opportunity to apply the simple mechanical contrivance of the completely severable connection. In the plaintiff's machine, single and double spindle, benefits pertaining to the work itself, in quality of the work, and in tool saving were claimed. The thought underlying development of the duplex machine ("Twin-Ten") was the preservation of these benefits. It could not utilize the structure or mode of operation which characterized the defendant's machine. If it did so, it would cripple the machine's performance, and so the plaintiff turned to the development of agencies for stroke changing, based on physical principles and requiring a mode of operation entirely different from that of the defendant's mechanical scheme. In lengthening the stroke and in shortening it, the appliance of the defendant lends itself to one mode of operation which consists of placing the secondary spindle in selected loading position, adjusting its stop, casting the spindle out of operation, moving the primary spindle to any position wished, setting its stop, and then reconnecting it. In the plaintiff's device the stop is set when the machine is operated. Indeed, the plaintiff made claim that it sacrificed the ability to use a front stop for determining stroke locus and incurred the expense of providing all the auxiliary equipment described and thus provided in its own way for all its problems of stroke changing. The defendant taught no way that the plaintiff could use to accomplish its desired results. Baker-Perkins Co. v. Thomas Roulston, Inc., 62 F.(2d) 509, 513 (C. C. A. 2).

There is no infringement because there is no similarity of means and mode of operation of plaintiff's design and the defendant's claim.

Decree reversed.