OLD TOWN RIBBON & CARBON CO., Inc.,
v. COLUMBIA RIBBON & CARBON
MFG. CO., Inc., et al.

Civil Action No. 3653.

District Court, E. D. New York.

July 16, 1946.

Levisohn, Niner & Levisohn, of New York City (Edwin Levisohn and Harry Cohen, both of New York City, of counsel), for plaintiff.

Darby & Darby, of New York City (Samuel E. Darby, Jr., and Floyd H. Crews, both of New York City, of counsel), for defendants.

BYERS, District Judge.

The plaintiff seeks a declaratory judgment that defendants' patent No. 2,118,888, entitled "Master Copy Sheet", is invalid. That is the one real issue, since infringement as to claim 10 is not contested, and as to claim 11 the argument is not of impressive dimensions. No other claims are in suit.

The patent is addressed to the practice of making reproductions of written or typed matter through the use of hectograph ink which is contained in carbon paper impregnated with it. The original writing or typing is done on a sheet of paper, under which the hectograph carbon is placed, and the hectograph impression is transferred to another sheet which becomes the master sheet from which the multiple copies of the matter so transferred are made.

Two processes are available for this purpose; in one, the spirit type, the master sheet is itself the active agency, the multiple copies being made directly from it, after it has been placed upon a cylinder which in effect becomes a printing press. About 500 copies can so be made.

The other process involves the use of a gelatin pad, which is moistened, and upon which the master sheet is impressed, thus transferring to the pad the written or typed matter in hectograph ink; then the pad becomes the agency of duplication, the multiple copies being made from it. This is called the gelatin pad method, and about 100 copies can so be made.

It will be seen that the written or typed matter must be in reverse order for reproduction, which means that when the master sheet serves as the agency in the spirit type process, it must receive the reading matter in that order; but when it transfers its contents to the gelatin pad, the latter must receive in reverse, which means that the master sheet must itself read in direct order.

The invention, if presently understood, consists in such an arrangement of the top sheet, the hectograph carbon surface, the master sheet, and the reverse side of the latter, that written or printed matter in hectograph ink can be impressed upon the master sheet, either in direct order, or in

reverse, according to which type of agency is to be employed for making the multiple copies.

The patent was granted May 31, 1938, on application filed September 30, 1936, and teaches two sheets of paper joined at the top, or one long sheet so folded and creased as to produce two sheets; thus four surfaces exist:

(a) which can receive written or typed matter;

(b) the reverse side of (a), which is the hectograph coated surface;

(c) which faces (b) and is plain paper and becomes the master sheet upon which the matter to be reproduced is received in hectograph ink characters;

(d) the reverse side of (c), which is plain paper, upon which matter may be written or typed;

(e) a separate sheet of oil or wax tissue between (b) and (c) to prevent smudging of the hectograph carbon, when the device is not in use; this slip of course is withdrawn when writing or typed matter is inscribed on (a) or (d) and appears upon (c), the master sheet.

So related, and the slip sheet having been withdrawn, matter written upon (a) is impressed upon (c) through the action of (b) in regular order; if, however, it is placed upon (d) it will be impressed upon (c) in the reverse order, because (b) faces (c).

There was nothing new brought about by this invention, save the use of two sheets of paper held in the relation described, for either of the two said forms of transcription upon (c), the master sheet.

Prior practice had involved the use of separate sheets, with the hectograph carbon disposed in the correct relation, for the desired transfer to the master sheet, but it was new to use the same two sheets of paper in either the one aspect or the other, depending upon the process in which the master sheet was to be employed.

The claims in suit are as follows:

"10. A device for making a master copy sheet for use either in the gelatin type or in the spirit type of reproduction, comprising two sheets of substantially the same size arranged in superimposed relation, a hectograph transfer ink coating on the inner face of one of said sheets, whereby a typed impression made on the opposite side of said coated sheet will be transferred to the inner face of the other of the two sheets, with the letters in the conventional order from left to right, whereas a typed impression made on the outer face of said other sheet will appear on the inner face thereof, with the letters in the reverse order, and a sheet of protective material between said superimposed sheets in contact with said inner faces to prevent smudging of the uncoated inner face by the coated face, prior to either of the aforesaid typing operations, said protective sheet being removable to permit said typing operations.

"11. A copy sheet of the character set forth, comprising a piece of paper folded and weakened along a center line, thereby forming superimposed panels, the outer side of each panel having a surface adapted for typing thereon, and the inner side of one of said panels having a coating of hectograph transfer material thereon with uncoated margins at the top and bottom, and a protective sheet positioned between said panels and of a size to cover the coated area, but leaving an uncovered area at the top margin, whereby said panels may be grasped near the fold at the top without smudging the surface which faces said top margin, and said protective sheet withdrawn by a downward pull."

The plaintiff's product, Exhibits 1 and 2, called the Dupliform, is a substantial duplication of defendants' master unit and was put upon the market later, but in these days in which reaping where one has not sown is acclaimed as the practice of free enterprise, it will be convenient to pass at once to the issue of validity, having in mind that the plaintiff is something less than consistent in asserting that the patent is at once a menace, and an anemic thing.

The plaintiff's expert admitted that no prior patent teaches the alleged invention in suit. He relied most strongly upon *Foster No. 2,060,190* granted November 10, 1936, on application filed January 10, 1935. It is for "Article and Process for Multiplying Records".

The sole product claim is:

"6. As an article of manufacture, a sheet adapted to receive data on one side

and having on the other side a deposit of hectographic printing ink defining form matter in negative presentation, said deposit being adapted to produce repeated prints of said form matter when said sheet is normally employed as a master sheet in the so-called spirit process of multiplying copies."

In other words, a single sheet is claimed, as (c) in the preliminary explanation above, the data being written on (d), and the particular adaptation is to forms.

The specification beginning at line 4 of page 1, explains the prior practice in connection with employing the spirit type of reproduction in filling out forms.

Nothing is shown by way of an assembly of two sheets, resulting from folding one, or attaching two together, which assembly was adaptable for use in either type of duplication. The most that can be said for anticipation is that this patent teaches one sheet having a coating of hectograph carbon on one side, and being plain on the other. It does not anticipate the patent in suit.

The plaintiff argues that unitary carbon and copy sheets are described in other patents, namely:

*Matthews & Holland No. 806,818* (1905) granted for "Manifolding-sheet for Typewriting". The showing is of one ordinary carbon attached to one sheet of plain paper, the original being written on a top sheet, and the carbon impression made on the sheet attached to the carbon. No reversal of operation is either appropriate or suggested.

*Lee No. 714,806* (1902), another combination of a carbon sheet and a plain sheet of paper "or other suitable material" upon which a design may be traced from a top sheet.

*Lewis No. 972,549* (1910), a similar arrangement for sales slips. Other similar patents add nothing to this feature of the argument.

It was testified for plaintiff that in 1933 it made up a special order of 10,000 unitary sheets of hectograph and plain paper for a manufacturer of the spirit type duplicating device, and while no supporting data in the form of records were produced, the testimony is accepted as establishing the fact for the purpose of this litigation. Since that order was confined to a product for use only in the spirit type process (see Foster No. 2,060,190) it could not have been also adapted for use in the gelatin pad process, for reasons which have been explained; anticipation has not been shown.

It is also true that leaving an uncoated margin on ordinary carbon paper to facilitate handling without soiling the fingers is old: *Rogers No. 132,324* (1872) and probably *Phillips No. 1,804,806* (1931), see claim 5, and so much of claim 11 in this patent as teaches such margins must be deemed to have been anticipated. It was also old to provide a wax paper sheet to protect the hectograph surface, and to keep it from coming into contact with other paper prior to use: *Smith No. 342,142* (1886); and a similar slip sheet was used to keep carbon paper from rubbing against an unused sheet of plain paper: *Bottle No. 1,048,029;* and thus invention cannot be predicated of the slip sheet as stated in both claims now in suit.

Having thus reduced the invention to its lowest terms, there remains the concept of two sheets of paper, in fact or in effect, one of which bears a hectograph ink surface, except for top and bottom margins, so disposed as to be susceptible of use in either of two duplication processes in which the essential characteristics of the hectograph ink are employed.

It was an advance over the single sheet product, and has been widely adopted and in increasing volume since it was first put upon the market. It is not a helpful thing to have resort to what the courts have written in this connection concerning commercial success. As to whether that development may be consulted on the issue of patentable invention, the answer seems to be, sometimes.

That which appears by way of formulation of the elusive criteria of invention, in Safety Car Heating, etc., Co. v. General Electric Co., 2 Cir., 155 F.2d 937, under date of May 13, 1946, may be quoted in part:

"In appraising an inventor's contribution to the art, as we have often said, the

most reliable test is to look at the situation before and after it appears. Substantially all inventions are for the combination of old elements; what counts is the selection, out of all their possible permutations, of that new combination which will be serviceable. No objective standard is practicable; * * *. Courts, made up of laymen as they must be, are likely either to underrate, or to overrate, the difficulties in making new and profitable discoveries in fields with which they cannot be familiar; and, so far as it is available, they had best appraise the originality involved by the circumstances which preceded, attended and succeeded the appearance of the invention. Among these will figure the length of time the art, though needing the invention, went without it: the number of those who sought to meet the need, and the period over which their efforts were spread: how many, if any, came upon it at about the same time, whether before or after: and—perhaps most important of all—the extent to which it superseded what had gone before. We have repeatedly declared that in our judgment this approach is more reliable than a priori conclusions drawn from vaporous, and almost inevitably self-dependent, general propositions."

■ The effort will be made to apply the foregoing to the evidence in this cause, in the realization that the process cannot yield automatic results since there is bound to be latitude of interpretation in the attempted adaptation of even so clear and helpful a summary.

As to the length of time that the art needed the invention, but lacked it:

The spirit type process came upon the market in 1931–32, and so for nearly five years (this application was filed September 30, 1936) there seems to have been no attempt made to devise such a copy sheet which would serve that as well as the needs of the much older (say 20 years) gelatin type process. That was the period which would measure the need.

The commercial response to this patent argues in favor of its high utility, for six licenses have been taken by other manufacturers, and the defendants' own business has expanded greatly. Much of that growth was due to departmental requirements of the Army and Air Services, and so the figures are not quoted, because no allocation has been made between governmental and commercial demands.

As to the number who sought to meet the need, there were none apart from these patentees, since certain other manufacturers took licenses, and the plaintiff chose to make its own device, relying upon being able to demonstrate the infirmity of this patent.

Finally, as to the extent that the master unit has superseded the single use unit of earlier days, the defendants' testimony is persuasive that their own production has been multiplied by three during the past five years, while the plaintiff's experience has been otherwise: In 1943, its Dupliform accounted for but 23%; in 1944, 32%, and in 1945, 22% of its hectograph business, the balance being in separate hectograph sheets, presumably for both types of duplicating process.

At least, it can be deduced from the testimony that this form of master copy sheet has achieved a substantial success, and has superseded the separate sheets to such a degree that the plaintiff instituted this litigation to promote its own interests in the field.

■ The principal assault upon the patent is that it is too simple and obvious a step, to join two such sheets of paper together, as have been described, and claim patentable invention for the result. Truly, it is a combination of known elements, but it cannot be written off for that reason alone. If it produces a new result, it involves invention, and I cannot escape the conclusion that it does. No dual purpose fold-over device is shown in the cited art; nor is there an apparent recognition of the essential difference between the employment of ordinary carbon paper for the making of multiple copies at one stroke of the pen or key, and the use of hectograph carbon for the making of one master sheet, which serves a later series of purposes of its own; the need for precise alignment in the latter case exceeds the former by

a wide margin, for reasons which have been made clear in the testimony of the witness Miller called by defendants.

If the two-sheet development was obvious, it is to be wondered why the plaintiff did not follow up its spirit type hectograph sheet which it made for Ditto in 1933, by taking the step which the patentees did in 1936, and producing the two-sheet device which it now makes and sells under the name Dupliform. That seems to be a convincing answer to the assertion that all that these patentees did was the thing that any one skilled in the art was bound to do. Since at least one enterprise, which has been skilled in the art for over twenty years, did not take this so-called obvious step, in the face of a hint which amounted to an invitation, I see no reason why this court should condone the lapse, if that is what it was, by declaring the grant to be void for lack of patentable invention.

It has been suggested in a number of cases that it is not the length of the step which measures its accomplishment, but rather its direction, if into new territory, and its consequences. The dual usage of this fold-over unitary construction is deemed to have been a step into new territory, which has accomplished those new results which are fairly within the contemplation of our system of patent law as now constituted.

The plaintiff has sought to reflect upon the patent otherwise as to its terms and the defendants' methods of granting licenses. The evidence does not sustain either argument, nor do the cited authorities apply to these facts.

As to infringement, there is no dispute concerning claim 10. The arguments made with reference to claim 11 are not convincing. The margin at the top of the hectograph sheet in plaintiff's exhibits is narrower than in defendants' structure, but if care is taken, as demonstrated at the trial, the slip sheet can be withdrawn. That is its office, of course, when the device is about to be put to use. The adaptability of Exhibit 1 for use in both processes of duplication was conceded by plaintiff.

Judgment is directed for defendants, holding the patent in suit to be valid and infringed as to claims 10 and 11, with costs, to be settled on notice.

Submit findings in accordance with the foregoing.