## OLD TOWN RIBBON & CARBON CO., Inc., v. COLUMBIA RIBBON & CARBON MFG. CO., Inc.

No. 98, Docket 20373.

Circuit Court of Appeals, Second Circuit.

Jan, 6, 1947.

Harry Cohen and Levisohn, Niner & Levisohn, all of New York City (Edwin Levisohn, of New York City, of counsel), for appellant.

Samuel E. Darby, Jr., and Darby & Darby, all of New York City (Floyd H. Crews, of New York City, of counsel), for appellees.

Before L. HAND, AUGUSTUS N. HAND and CHASE, Circuit Judges.

L. HAND, Circuit Judge.

The plaintiff appeals from a judgment which dismissed its complaint, and which granted an injunction upon the defendants' counterclaim against infringing claims ten

and eleven of Patent No. 2,118,888, issued to an assignee of Lewis and Menihan, on May 31, 1938. The complaint was for a declaration of the rights and obligations of the parties arising from this patent, including a claim for damages against the defendants because of their unfair competition with the plaintiff; the counterclaim demanded the usual injunction and accounting for the infringement of claims ten and eleven. The opinion in the district court is reported in 66 F.Supp. 929, and states the facts so completely and so adequately that we adopt it for the purposes of this appeal; we shall assume a familiarity with it in what we have to say. Lewis and Menihan's disclosure was to the last degree simple: a single sheet of paper folded together at one end (or, we will assume, two separate sheets, fastened at one end), the inner face of one of the sheets, or of one fold, having a coating of "hectographic" ink, which could be transferred by pressure to the inner face of the other sheet or fold, and which, when transferred would make that face available to multiply copies. If the typing were upon the outer face of the sheet or fold, whose inner face was coated with the "hectographic" ink, the text would be transferred to the inner face of the other sheet or fold in the same order as it had been typed; if the typing were upon the outer face of the other sheet or fold, the text would be transferred to the inner face of that sheet or fold in reverse, or mirrored, order. The inner face of the uncoated sheet after the transfer had been made, whether in indirect or mirrored order, was called the "master sheet."

For at least four years before Lewis and Menihan filed their application, two processes had been known, by which the "master sheet" could be used to multiply copies; much the older of these was the "gelatin pad" process. In this the "master sheet" was laid face down upon a gelatin pad; the text was offset upon the pad by pressure; and the pad could then be itself used as a printing platen. This process involved two reversals, or mirroring, of the text: when the "master sheet" was pressed upon the pad, the offset was in mirrored order; when the pad printed the copies,

the copies were themselves in turn mirrored. Thus it followed that the text on the "master sheet" must be unmirrored, and that demanded that the typing should be done upon the outer face of the coated sheet, or fold. The second, or "spirit," process came into commercial use in this country about 1932 when a German, named Ritzerfeld, began to exploit a machine for performing it, which he had patented in 1927. In this process the text offset upon the "master sheet" was itself used as the printing platen to multiply copies, and this involved only one reversal, or mirroring of the text. Hence it was necessary that the text should appear upon the "master sheet" already reversed, or mirrored, which meant that the typing must be on the outer face of the uncoated sheet or fold. Claim ten was for "two sheets," making, if attached at one end, the kind of sheet we have described, with a removable protective sheet inside to prevent the smudging of the inner face of the "master sheet." The specifications apparently mean the protective sheet to be attached to the operating sheets; but we can altogether disregard this sheet in both claims, for the defendants do not, and indeed obviously could not, rely upon it as an element to support the invention. Claim ten does not expressly declare that the "two sheets" shall be attached at one end; but, since this seems to be their uniform description in the specifications, and since it is necessary to the success of the disclosure for them to be attached, we shall assume that an attachment is implied. Claim eleven specifically calls for a "folded sheet," and is otherwise the same as claim ten except for a minor modification in the protective sheet. For our purposes the claims may be treated as the same.

As we hold that Foster's patent No. 2,060,190, issued on November 10, 1936, upon an application filed January 10, 1935, is a "prior invention" to the patent in suit, we shall describe it in some detail. Foster started with a disclosure of the "gelatin pad" and "spirit" processes which we have already mentioned, and said that his invention was particularly applicable to the "spirit" process, though it "may be useful in connection with both of these

processes." Then followed a passage which we quote in the margin,[1] the important part of which is that in carrying out the "spirit" process on the Ritzerfeld machine, it had in the past been "the practice (in order that the printed matter appear in negative on the rear side of the master sheet) to have each master sheet made with a hectographic copying sheet attached thereto with the inked side of the copying sheet lying against the rear side of the master sheet." The typing was then done on the outer face of the "master sheet" as was necessary in the "spirit" process. Although Foster described the "gelatin pad" process, and mentioned that his invention might be useful "in connection with it," he did not say or suggest that the "attached" sheets which had been used to prepare "master sheets" for the Ritzerfeld machine could also be used on the "gelatin pad" process by merely typing the text upon the outer face of the coated sheet. On the other hand, albeit he failed to see that the Ritzerfeld double sheet could be used convertibly in both processes, his disclosure of the sheets themselves was complete and clear. As it read, it was a perfect anticipation of both claims in suit, except for the absence of any suggestion that they were fit for the "gelatin pad," as well as for the "spirit," process.

Foster filed his application over twenty months before Lewis and Menihan filed theirs, but his patent did not issue until after they had filed, and his disclosure was therefore not prior art; if it is to invalidate their claims it must be because he was the "prior inventor." In Alexander Milburn Company v. Davis-Bournonville Company,[2] the Supreme Court reversed a decision of ours—affirming one of mine—that the issue of prior invention was different from that of anticipation, because the invention of a patent lay in the claims; and that no one could be an inventor "prior" to another, who had not claimed the combination of elements contained in the claims in suit. Therefore the issue of "prior invention," we thought, must always be determined by a comparison of claims—some latitude of interpretation being allowed. The Supreme Court thought otherwise; it considered all those combinations to be inventions of the earlier inventor, which could be abstracted from his disclosure, regardless of whether he had selected them as combinations at all. The issue was the same as that of anticipation: an earlier publication, or an earlier use, was an anticipation of any later claims which

---

[1] "In the past, in carrying out the process disclosed in the Ritzerfeld patent, when it was desired to make an original master record comprising fill-in matter in appropriate relation to a previously printed form, such as waybills, bills of lading, invoices, etc.. it was the practice (in order that the printed matter appear in negative on the rear side of the master sheet) to have each master sheet made with a hectographic copying sheet attached thereto with the inked side of the copying sheet lying against the rear side of the master sheet. The sheet was then printed on a press or otherwise to produce the form matter upon the front side of the sheet in positive presentation and, simultaneously, a negative copy thereof—through the medium of the copying sheet—upon the back side of the sheet. Having thus produced master sheets so far as concerns the printed form matter, these master forms, whether invoice, bill of lading or other form, could be filled in with handwriting or typewriting in the usual manner so that the ink from the ribbon of the typewriter or from the pen of the writer would be impressed upon the front side of the sheet in proper relation to the form matter printed thereon, and a carbon or hectographic copy thereof would be made in negative or reverse configuration upon the rear side of the master sheet—then complete both as to form matter and fill-in matter. Master sheets produced in this manner are expensive and may run as high as five or six cents apiece. Consequently it will be readily understood that where many such master sheets are to be made the expense becomes a considerable item. It is an object of the present invention to produce master sheets having form matter appearing thereon and which will be more effective to produce better copies of the original form matter than could result from the old process, and to do so at but a fraction of the expense involved in using the old process."

[2] 270 U.S. 390, 46 S.Ct. 324, 70 L.Ed. 651.

would read upon it, although it did not itself indicate that the author or user had been conscious of them. Accordingly we are to treat the disclosure in Foster's specifications of the past practice of using double sheets to prepare a "master sheet" for use in Ritzerfeld's machine precisely as though it had appeared in a printed publication before Lewis and Menihan had filed their application. The validity of the claims in suit therefore depends upon whether they can survive this disclosure, because they include the use of the double Ritzerfeld sheets not only in the "spirit," but in the "gelatin pad," process.

The Constitution (Art. I, § 8) gives Congress power to grant limited monopolies for "discoveries," and there is no antecedent reason for saying that Congress might not, if it chose, issue a patent for a new use of an old physical object, which is in fact closely akin to, if not identical with, an "art," like a process. There would be nothing unreasonable in so doing; substantially no "machine, manufacture or composition of matter" is ever new throughout; usually it is a combination of elements, all of which are severally old, and the invention consists in the mental act of fabricating the combination. Nevertheless, since 1793, unless a patent disclosed a "new and useful art," a new "machine," a new "manufacture," or a new "composition of matter," it has not been a valid patent.[3] If it be merely for a new employment of some "machine, manufacture or composition of matter" already known, it makes not the slightest difference how beneficial to the public the new function may be, how long a search it may end, how many may have shared that search, or how high a reach of imaginative ingenuity the solution may have demanded. All the mental factors which determine invention may have been present to the highest degree, but it will not be patentable because it will not be within the terms of the statute. This is the doctrine that a "new use" can never be patentable. In this circuit we have many times applied it,[4] and it has been recognized elsewhere.[5] As we have said in earlier cases, this does not mean that very slight physical changes in a "machine," a "manufacture" for a "composition of matter" may not be enough to sustain a patent; the act of selection out of which the new structure arises, is the determinant, and small departures may signify and embody revolutionary changes in discovery; but the law does not protect the act of selection per se, however meritorious, when it is not materially incorporated into some new physical object. From this it follows that it makes no difference how radically Lewis and Menihan's discovery changed the art by making double Ritzerfeld sheets convertible to both processes by the expedient of merely typing one outside face or the other; nor does it make the least difference how completely the discovery, qua discovery, fulfills all those conditions mentioned in Safety Car Heating & Lighting Co. v. General Electric Co.[6] It is scarcely necessary to add that the claims in suit are not for an "art" or "process."

Judgment reversed; cause remanded for further proceedings consistent with the foregoing.

---

[3] Act Feb. 21, 1793, 1 St.L. 318, § 1.

[4] H. C. White Co. v. Morton E. Converse & Son Co., 2 Cir., 20 F.2d 311, 313; Regar & Son v. Scott & Williams, 2 Cir., 63 F.2d 229; Oilgear Co. v. J. N. Lapointe, 2 Cir., 65 F.2d 380, 383; Hookless Fastener Co. v. G. E. Prentice Mfg. Co., 2 Cir., 68 F.2d 848; Ingersoll-Rand Co. v. Worthington Pump & Machinery Co., 2 Cir., 87 F.2d 320; Gillman v. Stern, 2 Cir., 114 F.2d 28, 30.

[5] Voightmann v. Perkinson, 7 Cir., 138 F. 56; Weir Frog Co. v. Porter, 6 Cir., 206 F. 670; Rauch & Lang Carriage Co. v. Hanlon, 6 Cir., 233 F. 673, 675; Kellogg Switchboard & Supply Co. v. Michigan Bell Telephone Co., 6 Cir., 99 F.2d 207, 212; In re Parker, C.C.P.A., 107 F.2d 612, 615; In re Thuau, 135 F.2d 344, 30 C.C.P.A., Patents, 979.

[6] 2 Cir., 155 F.2d 937.